The court appreciates the arguments presented in the previous case. If you can wait for just a moment until we can... The changing of the guard in an orderly fashion. You may proceed. Thank you, Your Honor. Good morning. My name is Jack Tucholsky. I'm here on behalf of Northern Plains. I would like to spend ten minutes of my time talking about the injunction. John Arum, representing a separate party, the Northern Cheyenne Tribe, will address the cross-appeal and do our combined rebuttal. And he will take ten minutes as well. The National Historic Preservation Act and NEPA-Hartlet claims are submitted on briefs and will not be argued. The district court issued an injunction that allows 500 new wells per year, and it's not really an injunction at all for my clients. It will permit massive development on my clients' ranches, roads, pipelines, wells, compressor stations, at the same time that BLM is supposed to be going back and studying an alternative that looks at perhaps not even developing these lands. And it is that portion of the injunction that, in reality, is not an injunction at all because it allows more new wells to be built per year than have been drilled in the last ten years combined. There's only 480 wells out there now. As a result of the injunction, there will be 500 new wells per year. There will be. I would think that would depend on whether, after drilling some wells, it looked to the companies drilling them like it was worth the money. They don't get them for free. Your Honor, the track record has been is that when they apply for, you know, that they want to develop this land, all the wells, most of the wells that have been drilled have been successful. So you're saying it's established that there is a vast resource of natural gas available to the country there? There is a resource there, yes. And that it will be worth drilling every well that's allowed by the injunction? They have certainly applied for almost all the permits for the first year in the injunction. You're saying in terms of the public interest, there's really a tremendous public interest in extracting the gas. It's not. It's in the oil company's interest to extract the gas because the price of natural gas. Do they keep it or do they sell it to homeowners to heat their houses and keep it? Even if they didn't have that much gas? It goes on the market. It's an inconsequential percent of our national gas. It's .00002 percent of our national gas consumption. The BLM itself acknowledges that there will be serious environmental impacts from this development. They acknowledge that there will be substantial groundwater depletion, and this is the type of harm that is of long duration. Let me ask you about the groundwater depletion. As I recall, at the time of the first injunction, the projected groundwater depletion was 12,000 gallons per minute, and it turned out that was false. It was only 1,000 gallons per minute, just a huge difference in magnitude, less than was projected. How do we know that we're not dealing with the same kind of sky as falling? Your Honor, it's not a sky as falling in your argument. The rates vary, but this is BLM's own projection. Yeah, I know, but BLM's own projection was 12 times what turned out to be the truth the last time. This is allowing, in a two-year period, three times as many wells as have been drilled in the last 10 years, so there will be a substantial groundwater depletion, and once the spring is dried up, that is the type of long-term irreparable impact that an injunction should prevent. While the NEPA process, and understand we're not saying that some development isn't inevitable here, there's going to be some development, but we're talking about an injunction that said, go back and study this, look at possibly not allowing development on these particular ranches and on these tribal-sensitive areas and in the watersheds. At least consider that over the space of two years, so no one is saying that at some point that some of this gas or even all of it may not be extracted, but they're back in the NEPA process, and the injunction should at least preserve the status quo. The cases cited by the defendants, the Idaho watersheds and the High Sierra hikers case, in both of those cases, we were talking about an ongoing activity, grazing that had been going on for decades, and the court issued an injunction there that allowed the status quo to continue but certainly didn't authorize any new grazing. And in this case the court has authorized new development, and that really is unprecedented in this circuit's NEPA jurisprudence. Why – what is your understanding of why the district court held that there was a violation but didn't enjoin the project? Because the district court applied the wrong standard, basically. The district court said that we had to prove that irreparable harm had already occurred, and that's written in the text of his opinion. And the standard, of course, is whether or not environmental harm may occur. And we believe if he had applied the proper standard, based upon the record before the court, the harm to the ranchers, the depletion of groundwater and so forth, and the harm to the tribal interests, that harm was sufficiently likely demonstrated that he should have enjoined all new production except for exploration wells, which we've always said have no serious impact. Tell me if I've got this right. I thought that the court did not just allow wholesale development. Instead, the court limited development to 7 percent of the land covered by the impact statement while the supplemental impact statement was prepared, and also the court chose an area where that limited 7 percent of the land development would occur, where development had already commenced and infrastructure already existed. Is that true? Your Honor, yes, and that's ground zero for my clients. And the injunction doesn't do them any good when the bulldozers show up at their ranches and say, well, you're within this 288,000 acres, which is a huge chunk of ground, where development can continue. And so in reality, this was the area that was going to be developed anyway because that's where the infrastructure is. And that's why when I say, and I'm not trying to be disrespectful to the district court, but, you know, when the injunction really is not an injunction for my clients because they are in this development area, and that's why we come back before this court. We're not talking here about a wilderness. We're talking about ranches, right? We're talking about ranches and farms. It seems a little like if you buy surface rights to land, but somebody else owns the air rights, and then they start using the air rights, and you say, wait, you're interfering with my sunlight. Well, if you don't own the air rights, they're not hurting some wilderness natural environment. What can you do except buy the air rights? Well, but, you know, it's true that these are split estates, but the surface impacts can be very severe to farmers and ranchers, and that's why BLM has been ordered to go back and take a look at this very thing. I mean, you know, water is the lifeblood of the West, and if groundwater is depleted, you know, there's no farming, there's no ranching, the wildlife disappears and so forth. And so what we're saying is that district court, you were right on the merits. BLM, you've got to go back and take a look at possibly limiting or excluding these areas from full development because you've never done that. That groundwater depletion, isn't that what will be the main subject of any individual permits? It is something that there will never be a big picture consideration. One well is not going to deplete the ground one. We're talking about, you know, fields of 200 and 300 wells. Coal bed methane is much different than conventional oil and gas where you might have one well over, you know, several square miles. What you say is logical. It seems like it would support a cumulative impact analysis, but won't there be such an analysis? This was the only time that they were going to do the big picture analysis to decide whether or not to develop. I would agree with Mr. Bryson in the previous case when he said, yeah, they can say, well, you know, don't put the well next to the guy's window. Put it out by the barn. They can do some adjustments at that stage. But once they have opened it up to full development, you know, the horses are out of the barn, so to speak. And that's the look that the court said BLM needs to go back and redo. And what we're saying is, okay, then let's pause and preserve the status quo because we're going to try in the NEPA process to convince BLM that it should actually exclude some of these areas, and it has the authority to do that. And that really is the crux of our argument. Okay. And if the Court doesn't have any further questions, I will reserve the rest of the time for Mr. Aram. Thank you. Who's going next? I'm going to present the button. Yeah. So I think we're up to you. May it please the Court. My name is John Starr, representing the United States. I'll be taking ten minutes, and counsel for interveners will be taking ten minutes. The injunction here properly arises from the district court's traditional balancing of the equities on the facts here, and the court did not abuse its discretion in entering this very limited and carefully drawn objection. First, as to harm, we're in a rather unique situation. We've had over two years of actual on-the-ground experience here under the 2003 RMP amendments. And interestingly, the BLM has not observed or been notified of any instances of irreparable harm. More specifically, it's not observed or aware of any violations of Federal or State air quality standards or Federal or State water quality standards. Mr. Starr, when you said that it's carefully drawn, the district court's injunction is carefully drawn, can you help me with just why it enjoined some but not all this? Yes, Your Honor. The injunction is tailored to the court's substantive ruling on the phase development alternative. And what the injunction does is allow a very strictly drawn form of phase development to go forward. That's notwithstanding that there was a violation of the law? Yes, Your Honor. The district court found that there was a violation of NEPA for failure to consider a phase development alternative. I find that a curious injunction in that usually you want to maintain the status quo if there's a violation of the law so that the agency can take corrective action. This injunction was well within the court's discretion here. As Judge Kleinfeld pointed out, development is precluded on 93 percent of the potential surface area. It's only allowed to go forward on 7 percent. There are also very strict well limitations. Counsel pointed to a number of wells to date, but the real guidepost there is what would have been allowed. Well, but that's under a kind of a traditional injunction analysis, isn't it, about irreparable harm? Isn't there a little different attitude toward injunctions where there's already been found to have been a violation of NEPA? The district courts have discretion to allow some activities to go forward. And here it's the best authority for that. Pardon? What is the best authority for the proposition that despite a violation of NEPA, a district court may allow activity to go forward while a complying environmental impact statement is true? Yes, Your Honor. We would rely on the Supreme Court decisions in Weinberger v. Romero-Barcelo and Village of Gambell. Also, this Court's decisions in Idaho and several other decisions cited in our brief. I think what the Court needs to look at is the Does any of those say as opposed to imply that despite a violation of NEPA, a court may allow some limited activities to take place while a complying environmental impact statement? It's more by implication, Your Honor, than a direct statement. But here, again, the injunction is tailored to the substantive ruling. It doesn't go beyond the substantive ruling. And it will allow the agency to examine phased development. It actually What do you mean it's tailored to the substantive ruling? The substantive ruling is that the EIS was invalid in just one respect, but otherwise generally sufficient. And that was as to phased development. And the injunction here will aid the agency in examining phased development, but on a very controlled basis only in just this one area and subject to numerous conditions. On the well limits, for example. I guess I don't understand what that means. Does that mean that the district court said that the law was not violated with respect to the phase that it permitted to go forward? No, Your Honor. NEPA was violated with respect to phased development. It was violated after the 7 percent where it was permitting or ordered that drilling could go ahead. It will potentially allow some development in that one area. Now, another one of Judge Kleinfeld's questions was on how the agency chose that particular area. And it is near already existing development and infrastructure. And that will allow taking advantage of already existing corridors for utility lines, pipelines, et cetera. It will also allow for duplicative use of air compressors. So, again, it's a very reasonable and rational approach to this limited injunction. There will also be additional NEPA analysis. The record of decision says that no activities can go forward, an application for permit to drill, a plan of development, and a subsequent BLM approval. So there will be an additional environmental. Yes, Your Honor. Tell me if I've got this right. In Idaho watersheds, did we hold that the district court properly allowed the activities to go forward subject to provisions protecting the environment and cattle grazing, even though there was a NEPA violation? That's correct, Your Honor. That's absolutely correct. And here there will be. So that's just like this case? We believe it is. And here there will be many additional protections, even more so than in Idaho watershed. The limitations involve both the location and the pace of development, and they're very strict. On the 500 wells, for example, the EIS projected in years three and four of development, which are roughly the equivalent of the interim period here, that there would be 1,800 wells and probably over 2,000 wells in year four. So here the restriction of 500 is a very substantial one. There will also be a lot of operating conditions, groundwater protection obligations, and so on. And as I say, before there can be any ground-disturbing activities, a site-specific application must be submitted to BLM. An environmental assessment will be done under NEPA, and that itself can be challenged judicially at that stage. That will include analysis of groundwater impacts, including cumulative analysis as required under NEPA. So there will be that additional layer of protection there. On the wells, again, the 500 total is not Federal wells. The agency can only approve wells such that the total limit of Federal, State, and private would be 500 wells. So, again, it's a highly substantial restriction. The district court's injunction controls both the place and the pace of development here. What plaintiffs are really arguing is that injunctive relief must issue as a matter of course where you have a finding of an environmental violation. And district courts have more discretion than that. They can look carefully at the circumstances of each case, and that's precisely what the court did here. Didn't the district court say that the plaintiffs have to prove irreparable injury to get an injunction? Isn't that? Yeah. Well, irreparable injury is part of the required showings here, and there was some difference in the opinions there on that between the first order and the second. But what the court found, and the court held an evidentiary hearing, by the way, on the scope of injunctive relief. He allowed all sides to present evidence as to irreparable harm. The court found that the plaintiff's evidence of harm was speculative. By contrast, the court relied on the actual experience to date to find that there had been no showing of irreparable harm here. So the district court did address the harms. It found that overwhelmingly that those favored the government in this case for this very limited form of development to go forward in this narrowly drawn corridor. In any case, the standard here is abuse of discretion. I think the district court was well within its discretion in light of the protective conditions that it mandated for anything to happen. Any ground-disturbing activity, including exploration, Your Honor, cannot be. This is not a preliminary injunction, is it? I'm a little confused here. Yes, Your Honor. It could be characterized as permanent, but it's in effect only during the supplemental time. Yeah, while they comply with the statute. Exactly. It's not in order to determine whether the statute has been violated. It's not an injunction pending. That's correct, Your Honor. The district court has retained jurisdiction. The injunctions, in fact, I think until 15 or 20 days after the new record of decision is prepared. My 10 minutes are up. If the court has any questions, otherwise I'll. Thank you. Thank you, Your Honor. May it please the Court, my name is John Matropoulos. I represent the Innovena Defendant Fidelity. I'll be addressing the injunction. Mr. John Martin for Pinnacle Marathon will be addressing the cross-appeal. I'd like to emphasize very briefly, but right from the beginning, the importance of this case, not only to my client and other private developers, but to all of the public, to the nation, to Bighorn County and other counties in Montana and to the state of Montana. You have those arguments in the briefs, and I think it should not be discounted as de minimis. Now, more than ever, we need to develop clean sources of energy, and this is one of them. And as Mr. Jack Tucholsky admitted, this is a vast reservoir in Montana that we should get to developing. Now, concerning the injunction, let me first point out that it actually is a ban on any development in 90 percent of the development potential area in Montana, which I apologize, I don't have the exact million acres, but it's 8 or 16 or 14 million acres in Montana. It's a vast area. And what the district court did after reading the briefs, taking testimony and reporting to the district court on 7 percent of that area while the BLM addresses the single deficiency that the court found in the EIS. Now, secondly, let me point out that unlike Mr. Tucholsky, my recollection is that the court found only that single deficiency, and that was whether the BLM should have studied phased development. That does not imply to me that there would be no development. There was a no-action alternative, and that was rejected. So we're not talking about having no development here. We're talking about having perhaps phased development. But as Mr. Martin, I'm sure, will argue forcefully, that was not a reasonable alternative that BLM had to study. Now, as for the injunction, you will see if you have the chance to read the record or sit through the hearing, as I did, that the court very carefully crafted an elegant solution addressing, I believe, every one of the complaints that the plaintiffs raised. And something that's very significant but only implied in that is that the court actually found plaintiff's evidence was speculative, wasn't credible. There was only one of the witnesses that he gave any credence to, and then he discounted that because he said that witness failed to factor in on a water quality issue a very important fact, which is the amount of flow in the Tongue River. Notwithstanding that, the court issued an injunction that limited, for example, on water quality. It said there could be no discharges into unlined ponds. None of the ponds could be on channel. All discharges had to be pursuant to an MPDES permit. And all discharged water has to be treated water, except for the existing discharge that my client now has permitted under the State of Montana. Let me also point out that the record reflects that there are no water quality violations, and there's no prospect of a water quality violation of either the State or tribal water quality standards of the Northern Cheyenne Tribe. On another issue, which you've heard some about, the groundwater withdrawals, the court, taking BLM's recommendation, let me point that out, almost all of the features of the injunction came from BLM. The court said that all companies must enter a water well mitigation agreement with ranchers in the area, and if there is some impact shown, they need to extend out even further, I think a half mile or perhaps a mile, and enter a further agreement with other ranchers that might be impacted. The court also required, adding a stipulation that BLM did not propose, that the companies would have to do monitoring. So I think the court took, I know the court, took into account the concerns of the plaintiffs, and he addressed those in the injunction that he issued, even though he didn't find any of their evidence to be better than speculative. Let me also address the issue of a NEPA violation, and yet issuing an injunction that allows some development to go forward. In fact, Your Honors, there's clear case law in this U.S. Supreme Court, and the best case law at the beginning, or before the U.S. Supreme Court in amico production is in, came from this court, and four laws on board versus I can't remember whom, where this court found a NEPA violation and said that injunctions absolutely prohibiting any activity to go forward are not necessary in all cases in all instances. Courts are supposed to balance the equities and the interests and use their equitable power to craft an elegant solution. And I submit to you that's precisely what this district court did here, and one that will not harm any real, or cause any real harm to the plaintiffs. Thank you very much. Thank you. Your Honors, my name is John Martin, and I'll be addressing the cross-appeal today. We're here because the lower court invaded the province of the agency. It didn't simply decide whether BLM could comply with NEPA. Rather, it determined for BLM what is an appropriate alternative for the development of natural gas resources in Montana's Powder River Basin. We believe the district court erred in two different respects. I thought the court just decided what can be appropriately allowed while the NEPA process has been completed, not that it chose an alternative. Your Honor, to the contrary. The agency will choose the alternative, but it won't stick until the agency does a good environmental impact statement. And the injunction is to decide just how much of the status quo to preserve and in what manner while that's done. I don't see why that's picking the alternative. Your Honor, I should be more precise here. What happened is that the lower court said this alternative is a reasonable alternative warranting a detailed evaluation. This court's precedent has uniformly said that that is a decision that the agency can make under NEPA. And that's what the district court did. And to that extent, it invaded the province of the agency. And it was completely inappropriate. Your Honor, on two grounds we think it's inappropriate. First, we think it's plain that that alternative properly could have been rejected. BLM did not abuse its discretion by saying that this phase, this predetermined phased development alternative does not warrant a detailed evaluation. They did not abuse their discretion in that respect. And second, Your Honor, even if you accept for the moment that it was appropriate to do a detailed evaluation of that alternative, properly what should have been done is the district court should have remanded that to the agency so that the agency could look at the administrative record and determine for itself whether or not that was a reasonable alternative deserving of a detailed evaluation. That's precisely our point. You're right, Your Honor, that what the court said is that you're required to do a detailed evaluation. They didn't say anything about the selection of the alternative. But that decision as to whether or not this is an appropriate methodology deserving of the allocation of BLM's resources plainly is an invasion of BLM's progress. Why isn't telling them take a look at the phased development approach the same as saying it's arbitrary and capricious not to take a look at the phased development approach? Your Honor, I do think whether we use any of the three different phrases that this we've used the phrase reasonableness, we've said abusive discretion, and we've said arbitrary and capricious. No matter which of those three phrases we use, deference should be afforded to the agency, and it should have been remanded to the agency for that determination. It's a little abstract. Let me explain what I'm having trouble with. When I was a district judge, I'd read one of these, and if I read it and I say I can't understand why the agency didn't look at this, and they can't give me any good reason why they didn't look at this, isn't that when I'm supposed to say, well, it's arbitrary and capricious for them not to look at it? So they better look at it. Right. Two different points, Your Honor. First, I think in this particular case, there was a great deal of information that demonstrated the reason why BLM chose to not do a detailed evaluation of that alternative. And then second, Your Honor, in those instances where you said to yourself, the agency made a mistake. They didn't consider this alternative in detail. Your recourse was the recourse that, for example, Judge Froder took in the Smith case back in 1994. What happened there is that this court said, we're remanding to the agency, and the agency gets to determine how it complies with NEPA. It's inappropriate for the district court to say, this is the way you must do it. And so to that extent, Your Honor, I think it's a bit different. And let me, if I may, talk for a moment about what was in the record and what justified the rejection of this alternative and the rejection of simply doing a very detailed evaluation of what's been described as phased development. Repeatedly in a 22-page chapter, BLM pointed out that phased development would give rise to drainage, and that that by itself was a sufficient reason for BLM to reject this as an alternative. Your Honor, there's an ambiguity in the way this argument has been presented. There's an ambiguity in the way the comments were made with respect to phased development. On the one hand, I think we all understand what phased development means. And on the other, there seems to be a notion that phased development is something beyond what BLM in fact analyzed, which is to say gradual development over a 20-year period of time where not in one given year there would be any more than 12 percent of the development. So your time has expired. Thank you, Your Honor. May it please the Court, John Arum for the Northern Cheyenne Tribe. I'm going to provide a rebuttal argument on the injunction issue, and I'm going to respond to the cross-appeal. On the injunction issue, I want to first address the issue of harm. This is not a case like Village of Gamble where only exploration is contemplated. This case involves actual development of federal minerals and major long-lasting physical impacts to the environment. The groundwater is a critical impact, and everybody agrees that coal bed methane cannot occur without depleting the aquifer. It's the only way they get the gas out. It may take decades for those aquifers to recover. And really the only dispute is over how many wells and springs are going to be affected. Everybody agrees that taking the water out of the ground hundreds of feet of drawdown is going to affect wells and springs. The only issue is how many are affected. Even one spring, my clients testified, if it's a sacred spring, cannot be mitigated. The district court severely questioned in its so-called advisory opinion whether these well water mitigation agreements were really even adequate. I mean, how do you mitigate a rancher's loss of a well for many years? It's not really clear how that would even happen. I want to address also the issue that the injunction was narrowly tailored. If there have to be these mitigation agreements that the ranchers would hire engineers who would figure out a way to make it happen before they sign the agreement. Well, it's not clear that the ranchers have the discretion to refuse to sign the agreement. Remember, these are split estate lands and the subsurface is the dominant estate. And so basically, as I understand it, these ranchers are handed agreements. They can negotiate around the margins, but ultimately there's a right to drill. And so there's a real question about how effective these agreements really can be. It's not clear that the ranchers have to agree. I'm just having a problem. It's not like the usual environmental case where we have something that looks like or is claimed to be or really is or used to be wilderness. This is more like an urban case really where property is divided up between the subsurface rights, the surface rights, and the air rights. And, gosh, if you sell the air rights or if you buy property without the air rights your decision whether to pay a price is made with your eyes open to somebody else owning them. And then you say, but you can't do anything there. It seems more like a property law case than a traditional environmental case, even though in this particular case we get NEPA into it. I don't think anybody is saying that they can't do anything. But, first of all, these are federal minerals, and the federal government has to go through an environmental review process before it can allow development of these minerals. And there are competing values on this surface. For example, the tribe holds this area, even though it's not on the reservation. It's not in Indian country, right? It's not Indian country, but the tribe uses the area for hunting and gathering. It has incredible cultural. These are some ranches that are some miles away from the reservation and are privately owned largely by non-Indians. That's right, but my clients have longstanding relationships with these ranchers. They go back generations, and they're generally allowed to hunt on these lands. And my clients are concerned that this development is going to affect their hunting and gathering. My clients are concerned that it's going to affect the cultural resources in this area. This area is their ancestral homeland. My clients fought and died for this area. There are battlefields in this area that they would not like to see developed. And the whole point of going back and looking at phased development is to identify some of these areas that maybe shouldn't be developed. And the district court's injunction basically says, well, we're arbitrarily going to set aside an area where development is okay, and you don't have to go back and set aside these areas where development maybe shouldn't occur. And, I mean, that's why the injunction really isn't narrowly tailored. It's also the area where the development was likely to occur anyway. And the number of wells is twice or three times the number of wells that already exist. So to say that, well, there hasn't been harm so far, so that means there won't be harm in the future, that doesn't make sense because there's a dramatic escalation of this development. Actually, it was a little more significant than that. The harm that had occurred so far indicated that the projections of harm were crying wolf. Well, I don't think the BLM's own EIS was crying wolf. I think BLM's EIS was. I thought the court found that it was crying wolf. Like the BLM projected in its environmental impact statement 12,000 gallons per minute of groundwater being extracted, and it turned out that they were wrong by a factor of 12. And it turned out that they projected emissions from motors that were vastly overstated. So it seems like it was crying wolf. In a limited circumstance, the projections might have been wrong, but there's no assurance that with this additional development, the actual impacts might be closer to what was predicted. And in any event, there is going to be groundwater depletion. There's no way to get the gas out of the ground without depleting the groundwater. I want to address the case law. And I think that the point I want to make is that there really aren't any cases which allow substantial development which would involve a risk of environmental harm unless there are unusual circumstances where there's an EPA violation. The High Sierra hikers and Idaho watersheds case both involved preservation of status quo uses pending the preparation of an EIS. And in both of those cases, there was additional mitigation imposed. The Idaho watershed case involved grazing allocations, which had allotments that had been existent for years, if not decades. High Sierra hikers, the same thing. It was horsebacking in the Sierras. There's been horsebacking in the Sierras since the beginning of time. What we're talking about here is a totally new activity. They're superimposing an oil and gas development activity on top of the existing grazing. It's not preservation of the status quo. Four laws on board involved existing congressionally mandated long-term power contracts. And in addition, there were additional circumstances, unusual circumstances there that militated against an injunction. And finally, Village of Gamble was exploration only, and there was a finding by the court that there was no environmental harm. So those cases are very different than this one. I want to turn to the cross appeal and first address the issue of standing. It is true, isn't it, that in both High Sierra Hikers Association and in Idaho Watersheds Project, this court approved injunctions that allowed the environmentally harmful activity to go forward despite the violation of NEPA? If there was a continuing activity that had previously existed and the equities supported allowing existing activities to go forward. I mean, the court didn't want us to tell ranchers that had been using these lands for decades, no, you can't use them anymore because the agency made a mistake. That's different than saying don't go forward with new activities. I want to address the issue of standing on the cross appeal because I think it's an important issue. Our position is that interveners have not established injury in fact, which requires the invasion of a legally protected interest. And the reason is that the government has dismissed its appeal. And there's a long line of cases that establish that private interveners have no legally protected interest in the government's liability under NEPA, and that the federal government is the only proper defendant in an action to compel compliance with NEPA. Now, the court has made an exception for the remedy phase in Forest Conservation Council, but not for the merits phase. Now, it's true that these cases deal with intervention as a right, but they're on point for standing as well because the standing analysis, like the Rule 24a analysis, requires a legally protected interest. In fact, this Court has said in the Iniguez case that you need a greater, a more direct interest to establish standing than you need to establish intervention as a right. What is the closest case that supports this where the government says it's not a standing but an appeal, where you have standing to intervene? I mean, there was standing to intervene, not you, but there was standing to intervene. What is the authority that says that there isn't standing to appeal? Well, there's a whole line of cases, starting with Dinan v. Charles, which is a Supreme Court case, where there was enough interest to intervene, but when the government dropped out of the case, the Court said there's not enough interest for standing. The government was dropped out of the case. I'm just, you know, I just suppose that they talk to each other, and the government says we're not independently going to put our resources into this to appeal it, but you can do it fine, and it's fine with us. So they go ahead as interveners as a right and appeal. Right. The problem that we have is that it doesn't make sense that parties that had no right to intervene on the merits in the first place should suddenly have standing to prosecute an appeal after the government drops out. I don't know if that's so. Aren't they intervening as to the remedy? That's the only area that they have a right to intervene. But isn't that the area they are intervening on? Well, no, because they are bringing a cross appeal on the district court summary judgment decision, which has nothing to do with the remedy. It only addresses the merits. I thought they were intervening as to the terms of the injunction. We don't object to them providing input on the terms of the injunction. What the issue is is whether they can bring a cross appeal of the district court's threshold determination that the BLM violated NEPA when the BLM has essentially acquiesced in that decision and is not appealing it, and they have to establish independent standing to appeal that. And it's important to recognize that we have two separate orders here. The first order deals only with NEPA liability, and the government is not appealing that order. And so the question is, if the government doesn't appeal, is there still a case for controversy? Because only the government has a legally protected interest in its own liability. Yeah. It's an interesting question, but your time has expired. Okay. Thank you. The matter just argued is submitted for decision. And that concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Alarcon, Kleinfeld